**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

———————————————————————— )
CAITLYN JOHNSON,                              )
              Plaintiff,                )
                                  )
             v.                     )          **CIVIL ACTION**
                                  )          **NO. 13-40003-TSH**
CAROLYN W. COLVIN,                           )
Commissioner of Social Security              )
Administration,                              )
                                  )
              Defendant.                )
———————————————————————— )

<u>**MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION TO REVERSE**</u>
<u>**THE DECISION OF THE SOCIAL SECURITY ADMINISTRATION (Docket No. 21)**</u>
<u>**AND DEFENDANT'S MOTION TO AFFIRM**</u>
<u>**THE COMMISSIONER'S DECISION (Docket No. 29)**</u>
**September 6, 2016**

HILLMAN, D.J.

       This is an action for judicial review of a final decision by the Commissioner of the Social

Security Administration (the "Commissioner" or "SSA") denying the application of Caitlyn

Johnson ("Plaintiff") for Social Security Disability Insurance Benefits and Supplemental

Security Income. Plaintiff filed a motion seeking an order reversing the decision of the

Commissioner (Docket No. 21), and the Commissioner filed a cross-motion seeking an order

affirming the decision of the Commissioner (Docket No. 29).[1] For the reasons set forth below,

Defendant's motion is ***<u>granted</u>*** and Plaintiff's motion is ***<u>denied</u>***.

---

[1] A transcript of the Social Security Administration Official Record ("*AR.*") has been filed with the court under seal. (Docket No. 12 ). Citations to the AR page numbers are those assigned by the agency and appear on the lower right hand corner of each page.

## Factual Background

For purposes of SSI disability, a claimant must show that she had a disability which started before or during the period between the date of her SSI application (March 18, 2009) and the date of the ALJ's decision (October 27, 2011), and which lasted or was likely to last at least twelve months. 20 C.F.R. §§ 416.202, 416.305, 416.330, 416.335.

## Procedural History

Plaintiff filed her applications for DIB and SSI on March 18, 2009, alleging onset of disability on July 31, 2005. (AR. 22, 76, 154-64).[2] After her applications were denied initially (AR. 82-87) and on reconsideration (AR. 89-94), Plaintiff requested an administrative hearing. (AR. 95). The hearing was held in September 2011 before Administrative Law Judge ("ALJ") Judith Stolfo. (AR. 34-75). The ALJ heard testimony from the Plaintiff, who was represented by counsel, and from vocational expert Elaine Cogliano. (AR. 34). On October 27, 2011, the ALJ issued a decision finding Plaintiff not disabled. (AR. 19-33). On November 2, 2012, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner. (AR. 2-9). Plaintiff timely filed this appeal.

## Medical Evidence

In January 2005, Plaintiff was seen by her primary care physician, Kathryn Cohan, M.D., for complaints of low back and knee pain and frequent urination. (AR. 277). In March 2005, she

---

[2] Plaintiff was born in 1980. (AR. 58, 176). She was 24 years old on the onset date of her alleged disability. Plaintiff received a GED and a certificate in medial administrative assisting. (AR. 40). She also completed a year of college in 2008. (AR. 173). She has worked as a cashier, cook, pizza delivery driver, and receptionist. (AR. 167). Plaintiff last worked in January 2006. (AR. 106).

For purposes of DIB eligibility, a claimant must show that she became disabled on or before the date her insured status expired (here, September 30, 2006, AR. 24, 76), see Cruz Rivera Sec'y of HHS, 818 F.2d 96, 97 (1st Cir. 1986), and remained continuously disabled through the period covered by her DIB application (here, March 18, 2008, one year before the date of Plaintiff's application), see Mullis v. Bowen, 861 F.2d 991, 994 (6th Cir. 1988) (interpreting 42 U.S.C. § 416(i)(2)).

also complained of anxiety and depression, episodes of altered consciousness (which did not appear to be actual syncope or a grand mal seizure), and nosebleeds (probably due to sinusitis). (AR. 273-74). In June 2005, Plaintiff told Dr. Cohan that she had experienced an episode of wooziness when helping her father work on a boat. (AR. 269). Dr. Cohan noted that Plaintiff did not appear anxious or agitated. *Id*. Dr. Cohan indicated that a cardiac workup had been negative and that another doctor was currently assessing the possibility of a seizure disorder. *Id*. Dr. Cohan observed that Plaintiff habitually ate poorly, relying mostly on sugary foods, and that Plaintiff routinely resisted all suggestions regarding improvement of her diet, claiming that her daughter was allergic to all the recommended foods. *Id*. Plaintiff also claimed that her daughter got into cabinets and the refrigerator, even if these were locked. *Id*. Dr. Cohan made additional recommendations (taking into account Plaintiff's lack of upper teeth) and suggested that she see a dietician, a suggestion which also was declined. (AR. 270).

In June 2005, neurologist Dawn Pearson, M.D. noted that a brain MRI scan in May had been normal. (AR. 333). A Holter monitor had shown rare ventricular premature contractions, not associated with any symptoms. *Id*. Dr. Pearson felt that Plaintiff's near black-out episodes and headaches were probably due to dehydration and most likely hypoglycemia. *Id*. She ate rarely, but drank coffee and soda "essentially all day." *Id*. Her symptoms were complicated by irritable bowel issues and her inability to afford dentures. *Id*. In September 2005, Dr. Cohan noted that Plaintiff's osteopenia (lower than normal bone density) could be due to her use of Depo-Provera (birth control by injection) or due to a diet poor in calcium and vitamin and her lack of regular exercise. (AR. 266). Dr. Cohan felt that Plaintiff's intermittent neurologic deficits might be due to a "migraine equivalent," possibly triggered by her use of birth control pills. *Id*. She was being seen by another doctor for her neck and back pain complaints. (AR. 267). At the

end of the visit, Plaintiff asked Dr. Cohan to provide a note limiting her work activities, and Dr. Cohan agreed to write a note limiting her to no more than 30 hours a week.[3] At the time, Plaintiff was employed folding paper at a company called Jenson and Chase. (AR. 266-67). Dr. Cohan urged Plaintiff to begin using at least some of the recommended treatments, in particular physical therapy. (AR. 267). Later that month, Dr. Cohan noted that Plaintiff still had not begun taking any of the medications recommended for pain control because she wanted her psychiatric medications to be stabilized first, and she had not begun physical therapy due to scheduling conflicts. (AR. 263). Dr. Cohan felt that Plaintiff's mechanical back pain was the most likely cause of her symptoms, and that this could be aggravated by her work, which involved bending over an assembly line. *Id*.

At the end of September 2005, Plaintiff told Dr. Cohan that she had not yet begun physical therapy. Dr. Cohan re-emphasized the need for this (and for follow-up with Plaintiff's physiatrist, Lorraine Gomba, M.D.). *Id*. Plaintiff had begun using the prescribed medications for muscle relaxation and pain relief, and was disconcerted that the area of her pain could shift from day to day. *Id*. Dr. Cohan advised her that this is typical of pain caused by muscle spasms rather than bulging disks. *Id*. Plaintiff's work put her at risk for spasms due to the amount of bending required, but her employer had no jobs available that could accommodate her problem. *Id*.

In October 2005, Plaintiff was seen by Dr. Cohan for fever, malaise, and abdominal pain. (AR. 258). In November 2005, Plaintiff reported brief, intermittent coughing, which Dr. Cohan felt was due to a virus. (AR. 256). That same month, Dr. Gomba noted that MRIs showed disc bulging at L4-5 and L5-S1; there was a potential for some nerve impingement at L4-5. (AR. 323).

---

[3] Dr Cohan did not consider the visit to be a work assessment. "She does not think she can do 40 hours … I cannot perform a work assessment at the last minute." (AR. 266).

In February 2006, Plaintiff's primary complaint was left jaw pain, which Dr. Cohan thought was due to deteriorating left lower molars. (AR. 253).

In June 2006, Plaintiff was seen by orthopedist Richard Mulroy, M.D. in connection with her complaint of left knee instability. (AR. 320). On examination, Dr. Mulroy saw no sign of ligamentous instability or swelling; range of knee motion was normal. (AR. 321).

In July 2006, Plaintiff was seen at Milford Regional Medical Center ("Milford") in connection with imminent childbirth. (AR. 304-05). In August 2006, she was seen at Milford for abdominal pain. (AR. 299). Later that month, she told Dr. Cohan that she had some abdominal and lower back pain. (AR. 359). In December 2006, Plaintiff was seen at Milford for right ankle pain, following her fall down a few steps while carrying a box. (AR. 297). That same month, she had gallbladder removal surgery. (AR. 322).

In January 2007, Plaintiff reported that she had recently re-injured her back while trying to prevent the fall of her father, who weighed 300 pounds. (AR. 358). Dr. Cohan noted that practical difficulties made it hard for Plaintiff to get physical therapy for her back pain on a regular basis. (AR. 357). Plaintiff had bronchitis, which appeared to be due to a bacterial infection. *Id.*

In February 2007, Dr. Cohan noted that Plaintiff still was suffering from sinusitis, and prescribed a different antibiotic. (AR. 351). Plaintiff also expressed an interest in smoking cessation treatment. *Id*. In March 2007, Plaintiff was seen at Milford for complaints of nausea, vomiting, and diarrhea. (AR. 293). It was noted that she was pregnant. *Id*. She reported no anxiety or depression, and her mental status was normal. (AR. 293-94).

In April 2007, Plaintiff was seen at Milford for abdominal cramping, nausea, diarrhea, and leg numbness. (AR. 290). Her only medication was Tizanidine, a muscle relaxant. (AR.

291). She had no psychological complaints. *Id*. A week later, she returned, reporting continued symptoms. (AR. 286). Plaintiff apparently underwent a tubal ligation in July 2007. (AR. 283).

In August 2007, Plaintiff was seen at Milford for slurred speech. (AR. 283). She stated that she had first begun having episodes of slurred speech a year previously, after the birth of her child. *Id*. This problem was not associated with arm or leg weakness, facial drooping, or headaches. *Id*. Musculoskeletal and neurological findings were normal. (AR. 284). An EKG in September 2007 showed mild tricuspid regurgitation and a small pericardial effusion, but no sign of atherosclerotic disease or an unclosed atrial septum. (AR. 562).

In October 2007, Plaintiff was seen at Milford for left lower back pain that had begun suddenly, two days previously. (AR. 279). At its worst, the pain level had been moderate, but currently it was mild. *Id*. Plaintiff said she had a one-year old child and did a lot of lifting. *Id*. She was using no medications. *Id*. On examination, Plaintiff showed limited range of spinal motion and lower back tenderness; neurological and psychiatric findings were normal. (AR. 281).

In November 2007, Plaintiff told Dr. Cohan that she felt run down and needed to urinate frequently. (AR. 251). She continued to have low back pain, which had radiated into her right leg on two occasions. *Id*. Plaintiff said she had gotten very depressed during her last menstrual period. *Id*. Plaintiff did not appear to have a urinary infection and blood sugar testing did not indicate likely diabetes. (AR. 252). Later that month, Dr. Cohan treated Plaintiff for bronchitis and pharyngitis. (AR. 250).

In December 2007, Plaintiff was seen by Joseph Wilson, M.D. for neck contusions due to an assault by Plaintiff's boyfriend. (AR. 245). That same month Dr. Cohan treated Plaintiff for a continuing episode of either bronchitis or smoldering sinusitis, (AR. 243-44).

In January 2010, Dr. Cohan reported that Plaintiff could not perform even sedentary work on a sustained basis, and had been unable to do such work since at least November 2004. (AR. 649-51).

### RFC Assessments and Other Evaluations by Massachusetts Disability Determination Services

#### Physical RFC

In November 2009, S. Ram Upadhyay, M.D. reviewed Plaintiff's records and concluded that, for the period up through September 30, 2006, when Plaintiff's insured status expired for purposes of DIB (but not SSI) eligibility (AR. 24), she remained able to do light work, subject to limitations in climbing ladders, stooping, crawling, and working around hazards. (AR. 608-14).

In April and May 2010, J. Quinlan, M.D. and C. Jones, M.D. reviewed records relating to Plaintiff's physical condition and concurred with Dr. Upadhyay's assessment. (AR. 638; 639-44).

#### Mental RFC

In December 2009, psychologist Lawrence Langer, Ph.D. reviewed Plaintiff's mental health records and concluded that she could understand and remember short and simple instructions; she could carry out simple, one- to two-step instructions; she could maintain attention for two-hour periods; she could complete a normal work week at a sufficient pace; she could be socially appropriate; and she could adapt to minor changes in her work setting. (AR. 616-18, 632). In April 2010, psychologist John Garrison, Ph.D. reviewed the updated record and concurred with Dr. Langer's assessment. (AR. 637)

Dr. Kathryn Cohan, MD, Plaintiff's primary care physician, provided a residual functional capacity having a date of March 21, 2011. (AR. 1081-1083). She diagnosed back pain, depression and osteopenia. *Id.* Plaintiff was limited to standing no more than 10

minutes.  She could sit for 50 minutes at a time. Plaintiff would be absent more than four times a month because of her disability.  (AR. 1082).  Plaintiff was not a malingerer.  Plaintiff could not lift and carry 10 lbs. in a competitive work environment.  *Id.*

Dr. S. Ram Upadhyay provided a physical residual functional capacity assessment on November 16, 2009, at the request of the agency.  (AR. 608-619).  He noted a history of MVP and fluid around the heart  in the past and echo heart testing.  (AR. 609).  He confirmed there was an MRI in 2004 showing disc  protrusion at L4-5.  His report provides, "Credibility partial."  (AR. 609). According to Dr. Upadhyay, it was reasonable to limit [plaintiff] to light exertion with additional  restrictions.  *Id.*

Dr. Sandra Felder, MD, provided a mental capacity assessment of anxiety disorder and personality disorder.  (AR. 1111).  Plaintiff had problems with understanding and memory, sustained concentration and persistence, and marked problems with social interaction.  She had  a marked problem with the ability to accept instructions and respond appropriately to criticism with  supervisors.  (AR. 1112).

Bernard Szymanski, nurse practitioner, also provided a mental capacity assessment. (AR. 1342-1344).  Mr.Szymanski  noted that Plaintiff had a marked limitation with understanding and memory, specifically with respect  to her ability to understand and remember detailed instructions.  (AR. 1342).  She had limitations with  respect to sustained concentration and persistence.  She was limited in her ability to carry out detailed instructions, in her ability to maintain attention and concentration for extended periods, and with respect  to her ability to perform activities within a schedule, maintain regular attendance, and being punctual  within customary tolerances.  *Id.*  She had marked issues with her ability to work in coordination with or in proximity to others without being distracted, in

her ability to complete a normal workweek without interruptions from psychologically based symptoms, with her ability to perform at a consistent pace and with a standard number and length of rest periods, and, at times, extreme limitations with the number of absences plaintiff was expected to have within a month. (AR. 1343). Dr. Szymanski's opinion was consistent with Dr. Felder to the extent he also opined that plaintiff had marked limitations with social interaction. In his opinion, plaintiff had marked limitations in the ability to ask simple questions and ask for simple assistance, with the ability to accept instruction and criticism, and with her ability to get along with co-workers and adhere to basic standards of neatness and cleanliness. *Id.* She had marked limitations in plaintiff's ability to respond appropriately to changes in the work setting, to be aware of normal hazards and to take precaution, and to set realistic goals and make plans independently. Plaintiff had marked to extreme limitations in her ability to travel in unfamiliar places or to use public transportation. (AR. 1344).

Dr. Young K. Kim, a licensed psychologist, provided a consultative reexamination report at the request of Disability Examination Services based on a September 9, 2009 examination. (AR. 596-600). Plaintiff was taking Adderall, Risperdal and Clonopin, prescribed by Dr. Li. (AR. 596), and at the time had a GAF of 55.[4] In Dr. Kim's opinion, plaintiff suffers from "symptoms of mood swings, panic attacks, poor anger management, and high level of cravings, which along with her physical problems, prevent her from establishing appropriate social relationships and functioning effectively in an employment situation."

Plaintiff's GAF fluctuated over time. Treatment records from Marlborough Hospital indicate a GAF of 38, on an ESP Adult Comprehensive Assessment dated June 18, 2009. (AR.

---

[4] A GAF of 51 - 60 indicate moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). See *Diagnostic and Statistical Manual of Mental Disorders*, 4th Edition, Text Revision; DSM-IV-AR.

1233).[5].  Dr. Terry Smith, MD opined that Plaintiff's GAF was only 41 on May 12, 2011. (AR. 1256).  Plaintiff's GAF was 47 by May 13, 2011. Dr. Amy L. Prince, MD, also assessed a GAF of 43 on May 14, 2011.  (AR. 1269).   Dr. Prince's opinion was consistent with the opinion of Dr. Smith.

Dr. Xiangyang Li, MD, Ph.D, treated  Plaintiff between December 12, 2008 and September 11, 2010.  (AR. 1039-1082).  He diagnosed  generalized anxiety disorder, panic disorder with agoraphobia, and attention deficit/hyperactivity disorder.  (AR. 1039).  He assigned an Axis V GAF of 52 for treatment between April 11, 2009 and September 11, 2010. Plaintiff had at least 45 office visits during this period and Dr. Li noted Plaintiff was compliant with medication.  (AR. 1039).  Plaintiff has followed up here since December of 2008 with a litany of concerns and symptoms. She has been diagnosed with general anxiety disorder, ADHD, mood  disorder, psychosis NOS.  She has been treated with various medications with some affects but none that lasted long.  (AR. 1041).  Plaintiff had difficulty concentrating, she was depressed had  hallucinations, she was anxious, she felt depressed and had panic attacks, she was having a difficult time waking up in the morning because of medication, and she had difficulty sleeping (AR. 1039-1054).

Dr. Lawrence Langer, PhD, completed a Psychiatric Review Technique  report at the request of the agency on December 9, 2009.  (AR. 620-622).  He confirmed the diagnosis of organic mental disorders, affective disorders, and anxiety-related disorders, and ADHD.  Dr.

---

[5]A GAF between 31 - 40 is consistent with impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family  relations, judgment, thinking, or mood (e.g., depressed adult avoids friends, neglects family, and is unable  to work).  See Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, Text Revision; DSM- IV-AR. GAF ratings of 41 to 50 is associated with serious symptoms (eg: suicidal ideation, severe obsessional  rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (eg:  no friends, unable to keep a job).  See Diagnostic and Statistical Manual of Mental Disorders, 4th Edition,  Text Revision; DSM-IV-AR.

Langer also completed a mental residual functional capacity assessment. (AR. 616-618). He confirmed limitations in understanding and memory, sustained concentration, social interaction, and adaptation. She has some episodes of forgetfulness, poor concentration and decreased. (AR. 618). He offered conclusions regarding Plaintiff's ability to understand and remember short and simple instructions, and her ability to carry out simple one and two step instructions. He suggested Plaintiff could be "socially appropriate." Dr. Langer diagnosed cyclothymia. (AR. 623), a type of chronic mood disorder widely considered to be a milder or sub-threshold form of bipolar disorder. Plaintiff had functional limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. He indicated that she could do some ADLs at a slower pace.

John Garrison, PhD, provided a brief case records analysis at the request of the Agency. (AR. 637-638). His report provides a brief summary of the medicals including the opinion of Dr. Li, Dr. Kim and a brief description of activities of daily living. *Id.* He concluded, "With no new sources and no allegation of worsening –affirming PRTF and MRFC as written on 12/9/09." Similar case reviews were performed by Dr. J. Quinlan, M.D., (AR. 638) and Dr. C. Jones (AR. 639).

Standards of Review
*Standard of Review for the Commissioner*

*1. Entitlement to Disability Benefits and Supplemental Security Income*

To receive SSDI and SSI benefits, Plaintiff must show she has a "disability," defined in this context as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A); 20 C.F.R. § 404.1505(a). The inability must

be severe, rendering the claimant unable to perform any previous work or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505.

To determine disability, the ALJ evaluates the claimant's application utilizing the following five-step analysis:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the  Social Security regulations, then the application is granted; 4) if the applicant's  "residual functional capacity" is such that he or she can still perform past relevant  work, then the application is denied; [and] 5) if the applicant, given his or her residual  functional capacity, education, work experience, and age, is unable to do any other  work, the application is granted.

*Seavey v. Barnhart*, 276 F.3d 1, 5 (1st Cir. 2001).  It is the applicant's burden to show at Step 4 that s/he is not able to do past relevant work as the result of a "significant limitation;" if the claimant meets his/her burden, "the Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the applicant can still perform."  *Id.*; *see also* 42 U.S.C. 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as  the [ALJ] may require."). It should also be noted that "[a]ll five steps are not applied to every applicant, as the determination may be concluded at any step along the process." *Seavey*, 276  F.3d at 5.

### Standard of Review for Court Review of Commissioner's Decision

Pursuant to the Act, this Court may affirm, modify or reverse the Commissioner's final  decision, with or without remanding the case for rehearing.  42 U.S.C. § 405(g).  This Court  reviews the Commissioner's final decision to determine whether: (i) the correct legal standard  was applied, and (ii) the decision was supported by substantial evidence.  *Seavey*,

276 F.3d at 9;  *see also* 42 U.S.C. § 405(g).  While the Court's review of questions of law is *de novo,* the Court  defers to the Commissioner's findings of fact, so long as they are supported by substantial  evidence.  *Seavey*, 276 F.3d at 9-10.  Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Ortiz v. Sec'y of Health & Human Servs.,* 955 F.2d 765, 769 (1st Cir. 1991) (even if administrative record could support multiple conclusions a court must uphold Commissioner's  findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as  adequate to support his conclusion.")

     In applying the "substantial evidence" standard, the Court must bear in mind that it is the province of the ALJ, not the Court, to find facts, decide issues of credibility, draw inferences from the record, and resolve conflicts in the evidence. *Ortiz*, 955 F.2d at 769. Ultimately, the Court may affirm, modify, or reverse the Commissioner's decision, with or without remanding the cause for a rehearing, 42 U.S.C § 405(g), but reversal is warranted only if the ALJ committed a legal or factual error in evaluating a claim or if the record contains no "evidence rationally adequate…. to justify the conclusion." *Roman-Roman v. Comm'r of Soc. Sec.*, 114. Fed. App'x. 410, (1st Cir. 2004); see also *Manso-Pizarro v. Sec'y of Health and Human Services*, 76 F. 3d. 15 (1st Cir. 1996).

<u>*The ALJ's Findings and Decision*</u>

     A claimant's entitlement to SSDI and SSI turns on whether he has a "disability," which is defined in this context as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S .C. §§ 416(i), 423(d)(1)(A); 20 C.F.R. § 404.1505. The inability must be severe, rendering the claimant unable to do any of his previous work or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505–1511.

The Commissioner uses a five-step evaluation process to determine whether an applicant meets this standard. 20 C.F.R. § 404.1520 (a)(4).  At step one, the Commissioner decides whether the applicant is engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520 (a)(4)(i). If not, the Commissioner proceeds to step two. Step two requires the Commissioner to determine whether the applicant's impairment is "severe." 20 C.F.R. § 404.1520 (a)(4)(ii). If the claimant establishes that the impairment is severe, the Commissioner proceeds to step three and determines whether the impairment meets or equals one of the listings in the Listing of Impairments, 20 C.F.R. § 404, subpart P, Appendix 1. 20 C.F.R. § 404.1520 (a)(4)(iii). If so, the claimant is conclusively presumed to be disabled. *See Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S.Ct. 2287 (1987). If not, the Commissioner proceeds to step four. Step four asks whether the applicant's residual functional capacity (RFC) allows her to perform her past relevant work. 20 C.F.R. § 404.1520 (a)(4)(iv). If the claimant is capable of performing past relevant work, he or she is not disabled. If the claimant is unable to perform past relevant work, the burden shifts to the Commissioner on the fifth step to prove that the claimant "is able to perform other work in the national economy in view of [the claimant's] age, education, and work experience." *Bowen*, 482 U.S. at 142. If the Commissioner fails to meet this burden, the claimant is disabled and is entitled to benefits. *Id.*

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 31, 2005, her alleged onset date.

At step two, the ALJ found that Plaintiff had the following severe impairments: anxiety, depression, and degenerative disc disease. At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listing.

At step four, the ALJ found that Plaintiff had the RFC to perform sedentary work, except that: she needed the option to sit or stand at will; she could only occasionally stoop, crouch, and kneel; she could not crawl; she could occasionally reach but not overhead; she had to avoid hazards such as unprotected heights and dangerous moving machinery; she could handle simple (one to two step), routine, repetitive tasks that involved a low level of stress (no production rate pace work, but goal-oriented work); and she could handle no more than occasional interaction with the general public. The ALJ further held that Plaintiff could not perform her past relevant work as a waitress or a cook.

At step five, the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy. Specifically, the ALJ determined that Plaintiff could work in representative occupations such as linen sorter and packager. The ALJ based her ruling on the vocational expert's testimony that there were 1,200 linen sorter jobs in the local economy and 125,000 available nationally, and there were 1,000 packager jobs in the local economy and 110,000 available nationally.

### Errors Alleged by Plaintiff and Scope of Issues Raised on Appeal

Plaintiff raises four arguments: 1) that that the ALJ did not properly consider Plaintiff's testimony regarding her symptoms; 2) that the ALJ did not properly assess the medical evidence; 3) that the ALJ failed to incorporate Plaintiff's mental impairments into her finding on the scope of Plaintiff's RFC; and 4) that the hypothetical question presented to the vocational expert did not accurately describe Plaintiff's limitations.

*The ALJ's evaluation of medical opinion evidence*

Plaintiff first argues that in determining Plaintiff's RFC, the ALJ improperly weighed the medical opinions of Plaintiff's treating sources and the non-examining state agency consultant. An ALJ must "always consider the medical opinions in [the] case record," 20 C.F.R. §§ 404.1527(b); 416.927(b), and SSA regulations prioritize the opinions of a claimant's treating sources. *See* 20 C.F.R. §§ 404.1527(c)(1); 416.927(c)(1) (stating that "[g]enerally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you"). The treating source rule provides that the ALJ should give "more weight" to the opinions of treating physicians because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2); 416.927(c)(2). Controlling weight will be given to a treating physician's opinion on the nature and severity of a claimant's impairments if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *Id*.

In certain circumstances, however, the ALJ does not have to give a treating physician's opinion controlling weight. *Arroyo v. Sec'y of Health & Human Servs.*, 932 F.2d 82, 89 (1st Cir. 1991) (observing that "[t]he law in this circuit does not require ALJs to give greater weight to the opinions of treating physicians"). The regulations allow the ALJ to discount the weight given to a treating source opinion where it is inconsistent with other substantial evidence in the record, including treatment notes and evaluations by examining and non-examining physicians.

*Arruda  v. Barnhart*, 314 F. Supp. 2d 52, 72 (D. Mass. 2004); 20 C.F.R. § 404.1527(c)(2)-(4);

416.927(c)(2)-(4); *see also* SSR 96-2p, 1996 WL 374188, at *2. Where controlling weight is

not  given to a treating source opinion, the ALJ considers an array of factors to determine what

weight to grant the opinion, including the length of the treatment relationship and the frequency

of examination, the nature and extent of the treatment relationship, the degree to which the

opinion can be supported by relevant evidence, and the consistency of the opinion with the

record as a whole. *See* 20 C.F.R. § 404.1527(c)(2)-(6); 416.927(c)(2)-(6). Further, the

regulations   require adjudicators to explain the weight given to a treating source opinion and

the reasons  supporting that decision. *See* 20 C.F.R. § 404.1527(c)(2); 416.927(c)(2) ("We will

always give  good reasons in our notice of determination or decision for the weight we give

your treating  source's opinion.").

    The ALJ is required, however, to provide "good reasons" for deciding to give the treating

source's opinion the weight he did and must state "specific reasons for the weight given to the

treating source's medical opinion ... and must be sufficiently specific to make [it] clear to any

subsequent reviewers[.]" SSR 96-2p, 1996 WL 374188, at *5; see also, e.g., *Shields v. Astrue*,

2011 WL 1233105, at *8 (D. Mass. Mar. 30, 2011) (Dein, M.J.) ("Because the [*ALJ*] supported

his rejection of the treating physician's opinions with express references to specific

inconsistencies between the opinions and the record, [his] decision not to grant [the treating

physician's] opinions significant probative weight was not improper."). *Sanchez v. Colvin*, 2015

WL 5698413, at *7 (D. Mass. Sept. 28, 2015). "Inconsistencies between a treating physician's

opinion and other evidence in the record are for the ALJ to resolve." *Roshi v. Comm'r of Soc.

Sec.,* 2015 WL 6454798, at *6 (D. Mass. Oct. 26, 2015), quoting *Lee v. Astrue*, 2011 WL

2748463, at *11 (D. Mass. July 14, 2011).  The hearing officer is not required to—nor could he

reasonably—discuss every piece of evidence in the record. *Sousa v. Astrue*, 783 F. Supp. 2d 226, 234 (D. Mass. 2011), citing *National Labor Relations Bd. v. Beverly Enterprises–Massachusetts*, 174 F.3d 13, 26 (1st Cir.1999). Indeed, "[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party," *Ramos-Birola v. Astrue*, 2012 WL 4412938, at *20 (D. Mass. Sept. 24, 2012) (alteration in original), *quoting N.L.R.B. v. Beverly Enters.-Mass., Inc.*, 174 F.3d 13, 26 (1st Cir. 1999) (internal quotation marks omitted).

In the instant case, the ALJ found that Dr. Cohan's opinions were inconsistent with other substantial evidence contained in the plaintiff's record. In particular, the ALJ found that Dr. Cohan's assessment was inconsistent with the Plaintiff's history of sporadic attendance at medical appointments and refusal to follow the recommended treatment, which may have consisted of taking medication, physical therapy and exercise. The ALJ also found that Dr. Cohan's opinion was undermined by the Plaintiff's own reports of her ability to perform activities of daily living. As the ALJ emphasized, Plaintiff testified that she was able to perform light household tasks, shop for groceries, attend her medical appointments and care for her young child. The ALJ found it especially unlikely that an individual who is totally disabled would also be able to care for her five year old son "without a problem." Similarly, she found it inconsistent that an individual who was reported to have marked limitations in almost every area of mental functioning would have had more intensive psychological treatment.

Although opinions from treating and examining physicians may be considered helpful, and in many cases controlling, the ALJ is only required to make a decision that is supported by substantial evidence. Therefore, if the ALJ comes to a conclusion contrary to that of the treating physician and alternatively adopts the opinion of a non-examining source, then this Court must

uphold his decision as long as a "reasonable mind, reviewing the record as a whole, could accept it as adequate to support his conclusion." *See Roshi*, 2015 WL 6454798, at *9. This remains true even if this Court, sitting as a trier of fact, would conceivably rule otherwise. *Monroe v. Barnhart*, 471 F. Supp. 2d 203, 211 (D. Mass. 2007) (internal citations omitted). Because the ALJ's treatment of Dr. Cohan's opinions was supported by substantial evidence in the record, this court is not at liberty to disturb her decision on that issue. "The hearing officer is not required to – nor could he reasonably—discuss every piece of evidence in the record." *Sousa v. Astrue*, 783 F. Supp. 2d 226, 234 (D. Mass. 2011); accord *Foster v. Colvin*, 2016 WL  3360574. *10, (D. Mass. 2016) (Casper, J.) (reasoning that an ALJ is not required to discuss every piece of relevant evidence provided that her conclusion is supported by substantial evidence) (citation omitted). Here, the ALJ stated that she had based her findings "on the record as a whole." (AR.. 2). *Roshi v. Comm'r of Soc. Sec.*, No. 14-10705-JGD, 2015 WL 6454798, at *10 (D. Mass. Oct. 26, 2015).

Plaintiff contends that Mr. Szymanski's opinion is one of a "treating source." Mr. Szymanski does not fit the definition of a "treating source," however, because a registered nurse clinical specialist is not among the "acceptable medical sources" listed in 20 C.F.R. § 416.913(a). *See also Randall v. Astrue,* No. 09-cv-11273-NG, 2011 WL 2649967, at *1 (D. Mass. July 5, 2011). Rather, he is an "other" medical source. 20 C.F.R. § 416.913(d) . The opinions of other medical sources are not entitled to controlling weight and an administrative law judge is not required to provide "good reasons" for the weight assigned to such opinions or consult the factors in 20 C.F.R. § 416.927(c)(2)-(6). *Taylor v. Astrue,* 899 F. Supp. 2d 83, 88 (D. Mass. 2012). An administrative law judge still must adequately explain the treatment of opinions by other medical sources so that a reviewer can determine if the decision is supported by

substantial evidence. *Id.* at 88-89. Further, an administrative law judge cannot ignore entirely the opinions of other medical sources. *Doucette v. Astrue,* 972 F. Supp. 2d 154, 170 (D. Mass. 2013).

The ALJ did not completely ignore the opinion of Mr. Szymanski. Rather, Mr. Szymanski's psychiatric assessment, diagnoses, and notes were summarized in the ALJ's determination. (A.R. at 30.) The ALJ stated that Mr. Szymanski completed a mental capacity assessment on August 2, 2011 which bore a resemblance to the outcome and result and the mental RFC completed by Dr. Sandra Felder, on April 20, 2011 (*Id.* at 30.) Mr. Szymanski's evaluation indicated several "marked" to "extreme" limitations, with no explanation for making such a finding. The ALJ also noted that "the medical evidence of record does not reflect the kind of prolonged intensive therapeutic relationship that would be expected to justify such an opinion. Ultimately, the ALJ did not completely disregard Mr. Szymanski's opinion, but granted his therapist report little weight, because she is not an acceptable medical source. Dr. Felder's RFC checklist indication several moderate limitations, a "marked" limitation in Plaintiff's ability to accept instructions and respond appropriately to criticism from supervisors and one "extreme" limitation, in that she indicated the claimant would likely be absent from work 4 or more times in an average month. The ALJ gave this little weight, as the opinion was not supported by explanation or reference to evidence in the medical record and furthermore, the ALJ concluded that it belied Plaintiff's benign mental status exams and activities of daily living.

Plaintiff's relies on the reports of psychiatrist Dr. Li to argue that she had a greater degree of limitation than that found by the ALJ. It is clear that the ALJ addressed the opinion and reports of Dr. Li.  Dr. Li first began treating plaintiff in December 2008, over two years after Plaintiff's insured status expired.  (AR. 1079). Nothing in Dr. Li's treatment notes

suggests that he ever reviewed records relating to Plaintiff's mental condition prior to
December 2008.  Moreover, even as to the period of 2008-2010, Dr. Li's notes do not record
actual observations of behavior showing long-term inability to work or any results of testing
indicating that Plaintiff could not handle simple work involving only occasional public
interaction.  (AR. 1039-75).  Dr. Li's notes show some fluctuations in Plaintiff's condition
during December 2008 through August 2009, these were attributed to the need for medication
adjustments and worsened stresses in her relationship with her sister and her boyfriend. *Id*.
During this period, there were a couple mentions of suicidal ideations and only one mention of
vague hallucinations. *Id.*  There was no evidence of any significant psychosis or thought
disorder. *Id.* Despite fluctuations in Plaintiff's condition, Dr. Li routinely assessed her GAF as
being 52.  *Id*.

Dr. Li reported that Plaintiff could not function due to poor attention, could not
maintain  concentration and attention on a sustained basis, had significant memory problems,
was socially  withdrawn, and could not handle routine stress.  A R . 604-05.  The ALJ properly
gave little  weight to this opinion because Plaintiff's mental status findings were relatively
benign and the  limitations Dr. Li described went well beyond the observations in his notes,
resting largely on   Plaintiff's self-description of her condition. AR. 29. In discounting Dr. Li's
opinion, the ALJ   noted that Dr. Li assigned plaintiff a GAF score of 52.  Id..  While a GAF
score at this level can sometimes be consistent with an inability to work, this is not necessarily
so. *See Pepin v. Astrue*, 2010 WL 3361841, at *8 (D. Me. Aug. 24, 2010), *adopted at* 2010
WL 3724286 (D. Me. Sept.16, 2010); *Querido v. Barnhart*, 344 F. Supp. 2d 236, 246 (D.
Mass. 2004) (unaddressed GAF ratings of 45 and 50 did not appreciably detract from RFC
containing moderate mental  limitations).  "Although GAF scores can be helpful in evaluating

the extent of a claimant's  mental impairments, they are not dispositive when deciding whether

a disability exists." Eaton v. Astrue, 2009 WL 2015903, at *7 (D.N.H. July 7, 2009).  The ALJ

had a sufficient basis for discounting Dr. Li's opinion, even as to the period during which he

provided treatment for  Plaintiff.

Finally, Plaintiff criticizes the ALJ for giving some weight to the report of Dr. Kim, a

psychologist who evaluated Plaintiff in 2009, yet rejecting Dr. Kim's observation that

Plaintiff's  mental issues would prevent her from establishing social relationships and

functioning effectively in an employment setting.  The ALJ pointed  out that these particular

limitations were based solely on Plaintiff's statements to Dr. Kim and not on  any other

medical evidence in the record.  ( A R . 29).  In  addition, as the ALJ found, Dr. Kim's

findings are generally consistent with the mental RFC the  ALJ found to exist.  (AR. 29, 596-

600).  The only aspects of Dr. Kim's report not accepted by the  ALJ were ones based entirely

on Plaintiff's self-description of her alleged limitations. Id.

### The ALJ's evaluation of Plaintiff's credibility

Plaintiff next argues that the ALJ made an erroneous determination of Plaintiff's credibility

by discounting the Plaintiff's testimony regarding her physical and mental symptoms relative to the

jobs identified by the vocational expert (VE). Once it is found that a claimant has a medically

determinable impairment that could reasonably be expected to produce the claimant's symptoms,

the ALJ must evaluate evidence of the intensity and persistence of the symptoms, including

statements from the claimant. 20 C.F.R. § 404.1529(c)(1); 416.929(c)(1). However, a claimant's

subjective description of symptoms alone cannot establish disability; the ALJ must also consider

any other available evidence, including the objective medical evidence, to determine whether the

claimant's testimony is consistent with the remainder of the record. 20 C.F.R. § 404.1529(a), (c);

416.929(a), (c). Evaluating the entire record in this manner requires the ALJ to make a finding

about the credibility of a claimant's statements. SSR 96-7p, 1996 WL 374186 at *1. The ALJ's

credibility determination "is entitled to deference, especially when supported by specific

findings." *Frustaglia v. Sec'y of Health & Human Servs.,* 829 F.2d 192, 195 (1st Cir. 1987).

Social Security Ruling 96-7p explains how an ALJ must evaluate a claimant's

credibility under the regulations. *See* SSR 96-7p, 1996 WL 374186. The ruling requires an

ALJ to consider a claimant's statements in light of the entire record, and to include in the

decision specific reasons for the credibility finding that are supported by evidence. *Id.* at *2-4.

Specifically, an adjudicator must consider the following factors when evaluating the nature

and severity of a claimant's symptoms:

> (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of
> the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the
> type, dosage, effectiveness, and side effects of any medication the claimant takes or has
> taken to alleviate pain or other symptoms; (5) treatment, other than medication, the
> claimant receives or has received for relief of pain or other symptoms; (6) any measures
> the claimant uses or has used to relieve pain or other symptoms; and (7) any other
> factors concerning the claimant's functional limitations and restrictions due to pain or
> other symptoms.

20 C.F.R. §§ 1529(c)(3); 416.929(c)(3); SSR 96-7p, 1996 WL 374186 at *3; *see also Avery v.*

*Sec'y of Health & Human Servs.*, 797 F.2d 19, 29 (1st Cir. 1986) (describing factors ALJs must

consider in evaluating a claimant's subjective description of pain). The *Avery* ruling further

provides that a claimant's medical treatment history may either corroborate or discredit a

claimant's description of her symptoms. *Id*. at 7-8. However, the ALJ is not required to

address every *Avery* factor in her written decision. *NLRB v. Beverly Enters.-Mass., Inc.*, 174

F.3d 13, 26 (1st Cir. 1999). In this case, the ALJ carefully weighed evidence regarding the

nature and severity of Plaintiff's symptoms in light of the *Avery* factors. Plaintiff objects,

however, to the credibility determinations regarding Plaintiff's mental impairments, ability to

work, and her physical impairments.

Substantial evidence supports the ALJ's finding that Plaintiff's statements about her ability to work were not fully credible. In support of this conclusion, the ALJ noted that Plaintiff  testified that she takes care of her 5 year old son, manages a wide range of activities of daily living at a slower pace, cooks, cleans, drives, shops and interacts with her boyfriend. (AR. 27, 31). The  ALJ further observed that despite her claims of pain and anxiety, she answered questions throughout the one hour and fifteen minute hearing and did not appear to be uncomfortable in a seated position. This constitutes "more than a scintilla" of evidence to support the  credibility determination. *See R & B Transp., LLC v. U.S. Dep't of Labor, Admin. Review Bd.*,  618 F.3d 37, 44 (1st Cir. 2010).

Plaintiff alleges bias on the part of the ALJ based on what Plaintiff views as the impatient and curt manner in which she conducted the hearing, and by the nature of some of the remarks made in reference to some of Plaintiff's medical conditions. In particular, the ALJ opined that Plaintiff could not have been diagnosed with osteopenia at her age; her dismissive references to women's issues, including, "I have enough scar tissue to form several uteruses. I'm still working. Move on." and, "Half the women working have ovarian cysts that cause them pain … We all work, move on, something else." Finally, the ALJ seemed to refer to Plaintiff as a malingerer: "The claimant collects diagnoses."

"An administrative law judge shall not conduct a hearing if he or she is prejudiced or partial with respect to any party." 20 C.F.R. § 404.940. In assessing a charge of bias, the court must start with the presumption that the ALJ is unbiased, but this "presumption can be rebutted by a showing of conflict of interest or some other specific reason for disqualification." *Schweiker v. McClure,* 456 U.S. 188, 195 (1982). Plaintiff bears the burden of establishing a reason for disqualification. *Id.* at 196.

The Supreme Court has observed that remarks by the ALJ during the hearing that are critical or even hostile to a party are, alone, ordinarily insufficient to support a bias challenge. *Liteky v. United States,* 510 U.S. 540, 555–6 (1994) (stating that "expressions of impatience, dissatisfaction, annoyance, and even anger" are alone not enough to establish bias or partiality). For the court to find bias on the ALJ's remarks alone—and not some external factor demonstrating, for example, a conflict—the remarks would have to show such a high degree of antagonism that a fair judgment would be impossible. *Id.*

This is admittedly a difficult call for the Court to make purely on the record. Some of the ALJ's interruptions and comments might, or might not, have been discourteous or intimidating depending on how they were delivered. The court recognizes conducting the hearing in this manner may have placed an unsophisticated Plaintiff in a vulnerable position, particularly where one is not accompanied by an attorney representing him. Here, however, Plaintiff was represented at the hearing and this Court, while not condoning the brusque manner which seemed to characterize this hearing, would have to expect that Plaintiff's representation would ensure the fundamental fairness of the process. As the Supreme Court has noted, "[a] judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune" from being cast as a judicial disqualification. *Gaudet v. Astrue*, 2012 WL 2589342, at *7 (D. Mass. July 5, 2012), citing *Liteky*, 510 U.S. at 556.

### C. Failure to Incorporate Mental Impairments into RFC

Plaintiff next argues that the ALJ erred in not incorporating her mental impairments into the findings on the scope of Plaintiff's RFC. As discussed above, there is substantial evidence on the record to support the ALJ's reliance on the medical opinions that were relevant and

consistent with Plaintiff's impairments. *See Quintana v. Comm'r of Soc. Sec.,* 110 F. App'x 142, 145 (1st Cir.2004) (limit to unskilled work is appropriate when claimant's treating psychiatrist rated claimant's social functioning as "only 'moderately limited' " in most respects); *Falcon–Cartagena v. Comm'r of Soc. Sec.,* 21 F. App'x 11, 14 (1st Cir.2001) (claimant's mental impairments at most marginally affect available occupations where reports indicate moderate limitations in areas of functioning). This court has cited these cases in finding that "medical opinions indicating that a claimant is at least moderately limited in the relevant areas can 'adequately substantiate' an ALJ's finding that the claimant can function in a work environment." *Hines,* 2012 WL 2752192, at *10 (citing *Quintana* and *Falcon–Cartagena). Martel v. U.S. Soc. Sec. Admin., Com'r*, 2013 WL 6068241, at *14 (D.N.H. Nov. 18, 2013)

While "it is the claimant's burden to show that [s]he has an impairment or impairments which meets or equals a listed impairment in Appendix 1," *Torres v. Sec'y of Health and Human Servs.*, 870 F.2d 742, 745 (1st Cir.1989), it is the ALJ's responsibility at step three to analyze thoroughly all of the impairments she recognized at step two. 20 C.F.R. § 404.1520(a)(4)(iii) (requiring that "[a]t the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled").

Here, the ALJ's comprehensive discussion of Plaintiff's physical and mental impairments showed that she properly considered the claimant's impairments in combination. *See also Gooch v. Sec 'y of Health & Human Servs.,* 833 F.2d 589, 592 (6th Cir.1987) (holding that an ALJ's review of the medical record may show adequate consideration of the combined effect of a claimant's impairments, even if the impairments are discussed individually instead of collectively). In this case, the ALJ discussed each of Plaintiff's three severe impairments:

degenerative disc disease, depression and anxiety, in significant enough detail to satisfy SSR 86–8.

<u>*The ALJ's reliance on flawed hypothetical to the VE*</u>

Plaintiff's final argument is that the ALJ relied on flawed vocational expert testimony in concluding that Plaintiff could perform jobs that exist in significant numbers in the national economy. Plaintiff asserts that the ALJ's hypothetical failed to accurately address the full extent of her limitations. The full text of the ALJ's hypothetical, presented to the vocational expert, reads:

> [L]et's assume we are dealing with an individual same age, education and past work experience who can occasionally lift 10 pounds and frequently lift less than 10 who can stand and walk for four hours in an eight hour day and sit for six hours in an eight hour day with a sit, stand at will option, pushing and pulling subject to weight limitations, … frequent climbing, frequent balancing, occasional stooping, occasional kneeling, frequent crouching and no crawling, no hazards and … limited to unskilled, simple one, two step, limited to routine tasks, low stress defined as occasional decision making, occasional changes in the work place and occasional judgment, no rate pace production, only occasional interaction with the public.

(AR. 71-72). The vocational expert testified that such a person could work as a linen sorter or packager. (AR. 72).

For a vocational expert's opinion to constitute substantial evidence, the testimony regarding an individual's ability to perform jobs in the national economy must come in response to a hypothetical question that accurately describes the claimant's impairments. *See Arocho v.Sec'y. of Health & Human Servs.,* 670 F.2d 374, 375 (1st Cir. 1982); *Cohen v. Astrue*, 851 F. Supp. 2d 277, 284 (D. Mass. 2012). Where a hypothetical omits "any mention of a [claimant's] significant functional limitation" that is supported by the medical evidence, an ALJ cannot rely on the vocational expert's response. *Rose v. Shalala*, 34 F.3d 13, 19 (1st Cir. 1994). Simply put,

"the hypothetical posed to a [vocational] expert must include all of the claimant's relevant impairments." *Aho v. Comm'r of Soc. Sec. Admin.*, No. 10-CV-40052-FDS, 2011 WL 3511518, at *7 (D. Mass. Aug. 10, 2011); *see also Cohen v. Astrue*, 851 F. Supp. 2d 277, 285-87 (D. Mass. 2012) (remanding where hypothetical posed to vocational expert omitted the ALJ's finding of moderate restrictions of concentration, persistence, and pace.). Conversely, although an ALJ must comprehensively describe the claimant's limitations in the hypothetical question, she is not required to include limitations found not credible or not supported by the evidence.

Contrary to Plaintiff's claim, the ALJ included Plaintiff's mental impairments in the hypotheticals that he posed to the VE. "The opinion of a vocational expert that a Social Security claimant can perform certain jobs qualifies as substantial evidence at the fifth step of the analysis" as long as the opinion is "in response to a hypothetical that accurately describes the claimant's limitations." *Sousa v. Astrue*, 783 F. Supp. 2d 226, 235 (D. Mass. 2011).

The ALJ did include Plaintiff's mental impairments in the RFC that had a credible basis on the record:

> … limited to unskilled, simple one, two step, limited to routine tasks, low stress defined as occasional decision making, occasional changes in the work place and occasional judgment, no rate pace production, only occasional interaction with the public.

(AR. 72)

The VE's opinion that an individual with Plaintiff's limitations could perform certain unskilled jobs was based on a hypothetical question that incorporated Plaintiff's mild difficulties in coping with workplace stress, regarding simple tasks, limited decision making and maintaining consistency with respect to other aspects of the workplace. The RFC also included limitations on jobs that would require Plaintiff to maintain certain production levels or would require her to have more than occasional interaction with the public. "Because the RFC was supported by substantial

evidence, the VE's testimony, and the ALJ's reliance on it, were proper." *Price v. Astrue*, 2012 WL 4571752, at *9 (D. Mass. Sept. 28, 2012).

## Conclusion

For the reasons set forth above, Plaintiff's Motion For Order Reversing Decision of the Commissioner (Docket No. 21) is ***denied*** and Defendant's Motion for Order Affirming the Commissioner's Decision (Docket No. 29) is ***granted***.


**SO ORDERED**.

/s/ *Timothy S. Hillman*
TIMOTHY S. HILLMAN
UNITED STATES DISTRICT JUDGE